[No. 55982-1.   En Banc.   October 31, 1989.]

THE STATE OF WASHINGTON, *Petitioner,* v. ALFRED RICHARD CAMARA III, *Respondent.*

*Norm Maleng, Prosecuting Attorney,* and *Michael T.J. Hogan, Deputy,* for petitioner.

*Barbara A. Laners* and *Laners & Scales, P.S.,* for respondent.

DURHAM, J.—Respondent Alfred R. Camara III was convicted in King County of second degree rape. Citing instructional error, the Court of Appeals reversed the conviction and remanded for a new trial. *State v. Camara,* noted at 52 Wn. App. 1018 (1988). We granted the State's

petition for review, 112 Wn.2d 1016 (1989), and now reverse the Court of Appeals.

## I

Camara met T.D. at a gay bar in Seattle shortly after midnight on August 14, 1985. At about 2 a.m., the pair decided to go to Camara's apartment to have drinks. T.D. testified that he and Camara "also planned to be sexual with each other."

According to T.D., he and Camara "agreed there would be no intercourse and engage in some oral activity, but mostly kissing and hugging and explicitly stated there was going to be no anal intercourse." On direct examination by the State, T.D. explained why he had suggested the limitation against anal intercourse: "I didn't want to engage in anal intercourse. It is unsafe, and I don't find it pleasurable."

T.D. testified that, notwithstanding their prior agreement, Camara forced him to engage in anal intercourse. According to T.D., the pair commenced consensual sexual activities in Camara's bedroom, starting with kissing and then "turn[ing] into what you call a 69 position where we could each perform on each other." When Camara was unable to climax, T.D. asserted, he asked T.D. to lie on his stomach "so that he could get on my back and like rub against my back." From that position, T.D. said, Camara slid down "so that his penis was probing at my rectum." T.D. said he protested, "I don't want to do that", and yelled outside the room to Camara's roommate for help, but Camara forcibly persisted, shoving his penis into T.D.'s anus, grabbing his scrotum, biting his ear, and beating him in the face. According to T.D., Camara told him, "If you don't shut up, I am going to kill you. You got to take this. I know you want it. You got to take it." T.D. testified that Camara physically abused and threatened him for about 20 minutes, warning that "he would kill me if I told the cops" before letting T.D. leave the apartment.

Camara gave a very different version of his evening with T.D. He testified that when the pair commenced sexual activity he asked T.D. if he wanted to be the recipient of anal intercourse and that T.D. stated his assent and cooperated in the act. Afterward, the pair talked and T.D. gave Camara a back rub. During the back rub, Camara testified, T.D. tried to perform anal intercourse on him and became forceful when Camara declined. Camara said he rolled T.D. off his back, and that the two then exchanged punches and started wrestling, but reconciled and had a drink together before T.D. left. Camara's counsel argued that T.D.'s complaint of rape evolved when, believing that Camara had stolen his wallet, T.D. brought an assault charge which in the course of questioning and investigation was escalated into a rape charge; T.D., counsel argued, "got caught in the web" of his own allegations.

The trial court charged the jury as follows:

> To convict the defendant Alfred Richard Camara, III, of the crime of rape in the second degree, as charged in count I, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about the 14th day of August, 1985, the defendant engaged in sexual intercourse with [T.D.];
> (2) That the sexual intercourse occurred by forcible compulsion; and
> (3) That the acts occurred in King County, Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty as to count I.
> On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty as to count I.[1]

Additional instructions defined "forcible compulsion" and "consent":

> Forcible compulsion means physical force which overcomes resistance, or a threat, express or implied, that places a person

---

[1]This "to convict" instruction is substantially identical to one proposed by Camara, which differed only in the inclusion of the additional element, no longer part of Washington law, *see* Laws of 1983, ch. 118, § 2, "[t]hat [T.D.] was not married to the defendant".

in fear of death or physical injury to oneself or another person or in fear of being kidnapped or that another person will be kidnapped.

Consent means that at the time of the act of sexual intercourse there are actual words or conduct indicating freely given agreement to have sexual intercourse.

Camara proposed no additional instructions relating to the charge of second degree rape. His attorney did, however, note an exception to instruction 9, the consent instruction. Counsel argued: "[T]his restriction limits and requires that the defense has some burden of proving its defense, and what is not forcible compulsion has to be consent, that we have to somehow be proving consent if we are alleging there is no forcible compulsion."

The jury returned a verdict of guilty and the Court of Appeals reversed. As grounds for reversal, the court cited the trial court's failure to give a "specific burden of proof instruction" on the issue of consent. In the absence of such an instruction, the court held, a reasonable juror might not have understood that the State bore the burden of proving T.D.'s nonconsent to intercourse with Camara; jurors "may have believed that the defendant bore at least some burden of proof on this issue." The Court of Appeals found error also in the trial court's refusal to permit Camara an opportunity to cross–examine T.D. concerning his sexual history. T.D. had "opened the door" to such cross examination by testifying on direct examination that he did not find anal intercourse pleasurable, the court held. The court did not decide whether this error was harmless, however, noting that reversal of the conviction was necessary in any event because of the instructional error.

We disagree with the Court of Appeals in both of its findings of error and reinstate the judgment.

## II

Addressing first the instructional issue, we begin by considering two issues which underlie the Court of Appeals' finding of instructional error: Is consent a defense to rape

and does the prosecution bear the burden of proving the rape complainant's nonconsent to sex with the defendant?

The 1909 criminal code (as amended in 1973) described rape as

sexual intercourse . . . committed against the person's will and without the person's consent. . . .

. . . .

(2) When the person's resistance is forcibly overcome; or
(3) When the person's resistance is prevented by fear of immediate and great bodily harm which the person has reasonable cause to believe will be inflicted upon her or him . . .

RCW 9.79.010 (1974). The law was well settled under this statute that the State bore the burden of proving an alleged rape victim's lack of consent. *State v. Chambers,* 50 Wn.2d 139, 140, 309 P.2d 1055, 62 A.L.R.2d 1080 (1957); *State v. Thomas,* 9 Wn. App. 160, 510 P.2d 1137, *review denied,* 82 Wn.2d 1012 (1973).

When the criminal law was recodified in 1975, the concept of nonconsent was replaced with that of forcible compulsion. Both first and second degree rape are defined as "sexual intercourse . . . [b]y forcible compulsion".[2] RCW 9A.44.040, 9A.44.050(1)(a). "Forcible compulsion" in turn is defined as:

physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped[.]

Former RCW 9A.44.010(5).

Though the rape statutes no longer expressly mention nonconsent as an element of rape, we believe consent remains a valid defense to a rape charge, for several reasons. First, nonconsent traditionally has been the essence of the crime of rape. *See* Loh, *The Impact of Common Law and Reform Rape Statutes on Prosecution: An Empirical Study,* 55 Wash. L. Rev. 543, 548, 550–52 (1980); *see also* S.

---

[2]Rape in the first degree is distinguished by the presence of certain accompanying aggravating circumstances. Second degree rape alternatively occurs "[w]hen the victim is incapable of consent by reason of being physically helpless or mentally incapacitated". Former RCW 9A.44.050(1)(b).

Estrich, *Real Rape* 117 n.3 (1987). Second, the concept of consent has been retained in the new rape statutes in the element of forcible compulsion, its conceptual opposite.[3] *See State v. Kester,* 38 Wn. App. 590, 594, 686 P.2d 1081 (forcible compulsion is the opposite of consent), *review denied,* 102 Wn.2d 1006 (1984); Loh, 55 Wash. L. Rev. at 552 (same). Finally, the "continuing validity" of consent as a defense is implied by statutory provisions (1) describing crimes against victims who are "physically helpless" or "mentally incapacitated", *see* RCW 9A.44.050(1)(b); (2) defining rape as sexual intercourse with a victim who "did not consent", *see* RCW 9A.44.060(1)(a); and (3) permitting evidence of a victim's past sexual conduct only when pro-bative of consent, *see* RCW 9A.44.020(3). *Cf. People v. Hearn,* 100 Mich. App. 749, 754–55, 300 N.W.2d 396 (1980).

A more difficult question is upon whom the burden of proving the defense of consent lies. In support of its con-clusion that this burden rests with the prosecution, as it did under the 1909 rape statute, the Court of Appeals cites *State v. Chambers, supra, State v. Thomas, supra,* and *State v. Kalamarski,* 27 Wn. App. 787, 620 P.2d 1017 (1980). None is relevant to the question presented. *Chambers* and *Thomas* arose under the old statute and thus say nothing about how the new statutes apply. *Kalamarski,* the more recent case, involved a conviction for third degree rape and did not address the second degree rape statute under which Camara was convicted.

---

[3]While some have suggested that rape law reform has eliminated consent as an issue in rape prosecutions, *see, e.g.,* Bienen, *Rape III—National Developments In Rape Reform Legislation,* 6 Women's Rts. L. Rep. 170, 180–81 (1980); Comment, *Washington's Attempt To View Sexual Assault As More Than A "Viola-tion" of the Moral Woman—The Revision of the Rape Laws,* 11 Gonz. L. Rev. 145, 155 (1975), the substitution of "forcible compulsion" for lack of consent seems more a refinement than a reformulation. *See* S. Estrich, *Real Rape* 90 (1987) ("the problem has never been so much the terms of statutes as our under-standing of them: it is not that 'consent' is the right test and 'force' the wrong one, or vice versa . . .").

■ The burden of proof with respect to a criminal defense has two dimensions, one statutory, the other constitutional. The statutory aspect is determined by reference to legislative intent: On whom did the Legislature intend that the burden of proof should lie? The constitutional dimension arises from the due process requirement that the State bear the burden of proving every element of a crime beyond a reasonable doubt. *See In re Winship,* 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970).

A 2–part test we have applied in previous cases seeks to capture these two dimensions. The hypothesis this test addresses is whether the burden of proof for a defense should be assigned to the State:

> There are two ways to determine if the absence of a defense is an ingredient of the offense: (1) the statute may reflect a legislative intent to treat absence of a defense as one "of the elements included in the definition of the offense of which the defendant is charged", or (2) one or more elements of the defense may "negate" one or more elements of the offense which the prosecution must prove beyond a reasonable doubt.

(Citations omitted.) *State v. McCullum,* 98 Wn.2d 484, 490, 656 P.2d 1064 (1983) (quoting *Patterson v. New York,* 432 U.S. 197, 210, 53 L. Ed. 2d 281, 97 S. Ct. 2319 (1977)); *see also State v. Acosta,* 101 Wn.2d 612, 615–16, 683 P.2d 1069 (1984); *State v. Box,* 109 Wn.2d 320, 327, 745 P.2d 23 (1987). When either part of this test is met, we have held the State bears the burden of proving the absence of defense that is in issue. *See McCullum* (State bears burden of disproving self–defense in murder case); *Acosta* (State bears burden of disproving self–defense in assault case); *Box* (defendant bears burden of proof on defense of insanity).

■ On the statutory question, we believe the removal from the prior rape statute of language expressly referring to nonconsent evidences legislative intent to shift the burden of proof on that issue to the defense. *Cf. People v. Stull,* 127 Mich. App. 14, 19–21, 338 N.W.2d 403 (1983); *see also, e.g., State v. Edwards,* 104 Wn.2d 63, 68, 701 P.2d 508

(1985) (legislative revision of a statute presumptively indicates a change in legislative purpose). This conclusion finds support in the history and purposes of rape law reform.

> The new law channels the jury's focus, via instructions, on the culpability of the actor rather than the response of the victim. . . . The reform statutes announce society's interest in accurately identifying perpetrators of rape, not in reinforcing traditional assumptions regarding appropriate behavior of [virtuous] [men and] women.

Loh, 55 Wash. L. Rev. at 557; *see also* Comment, *Focusing on the Offender's Forceful Conduct: A Proposal for the Redefinition of Rape Laws*, 56 Geo. Wash. L. Rev. 399 (1988).

Turning next to the constitutional part of the burden–of–proof analysis, in prior cases we have inquired whether or not an element of the defense "negates" an element of the crime charged. For example, noting that the "lawfulness" element of self–defense negates the intent element of murder, the knowledge element of assault, and the recklessness element of manslaughter, we have held that the State bears the burden of disproving self–defense in murder, assault and manslaughter cases. *State v. McCullum, supra* at 494–96; *State v. Acosta, supra* at 616–19; *State v. Hanton,* 94 Wn.2d 129, 133, 614 P.2d 1280, *cert. denied,* 449 U.S. 1035 (1980). Applying this same "negates" analysis in *State v. Hicks,* 102 Wn.2d 182, 187, 683 P.2d 186 (1984), we held that the prosecution must disprove the defense of good faith claim of title in a robbery case because that defense negates intent.

In light of a recent decision by the United States Supreme Court, we have substantial doubt about the correctness of this "negates" analysis and thus decline to apply it in this case. In *Martin v. Ohio,* 480 U.S. 228, 230, 94 L. Ed. 2d 267, 107 S. Ct. 1098 (1987), the Supreme Court upheld an Ohio law assigning the burden of proving self–defense to the defendant in the context of a prosecution for aggravated murder (defined as "'purposely, and with prior calculation and design, caus[ing] the death of another'"). Acknowledging an overlap between self–defense and the

elements of purpose and prior calculation and design, the Court nevertheless held that the State's burden to prove the elements of the crime was unrelieved.

Following *Martin,* it appears that assignment of the burden of proof on a defense to the defendant is not precluded by the fact that the defense "negates" an element of a crime. Thus, while there is a conceptual overlap between the consent defense to rape and the rape crime's element of forcible compulsion, we cannot hold that for that reason alone the burden of proof on consent must rest with the State. Rather, we now hold that that burden lies, as we understand the Legislature to have intended, with the defendant.

This does not end our analysis, however. We also must ensure that the instructions given adequately informed the jury of the State's unalterable burden of proving beyond a reasonable doubt every element of the crime charged. *See Martin,* at 233–34. We have no difficulty in concluding that they did. The "to convict" instruction quoted above specifically informed the jury of the State's burden of proof with respect to the elements of second degree rape. A separate instruction more generally described the State's burden and the presumption of the defendant's innocence. Camara received his procedural due.

## III

We turn next to the asserted error in the trial court's refusal to permit cross examination of T.D. on the subject of his sexual history. On direct examination, T.D. testified that he had not wanted to engage in anal intercourse with Camara. "It is unsafe, and I don't find it pleasurable", T.D. said. On cross examination, Camara's counsel asked T.D. to explain this comment:

Q When you say you don't like anal sex, you say you never liked it or don't generally like it?
A I have never enjoyed it.
Q In other words, you have received it but don't enjoy it?
[An objection was overruled.]

A The only time I have had anal sex is with my lover—one man.
Q So you have had it?
A Yes, I have.
Q Your testimony is that that is the only occasion you have ever had it?
A Yes.
Q And then it was him that transmitted the gonorrhea?
[An objection was sustained.]
Q Your testimony is that you have never had anal sex with anyone else?
A No.
Q Is that Rushie (sic) you had that with—
[Objection.]

With the jury absent, Camara's counsel made an offer of proof that T.D. had engaged in anal intercourse more than the one time with his lover that his testimony acknowledged. In light of this, counsel requested opportunity to cross–examine T.D. on his past experiences with anal intercourse. Relying in part on a pretrial ruling precluding inquiry into T.D.'s past sexual experiences, the trial court rejected Camara's request.

Camara contends that by limiting his inquiry into T.D.'s sexual past, the trial court violated his constitutional right to cross–examine adverse witnesses. The Court of Appeals accepted the substance of Camara's argument, but based its ruling on RCW 9A.44.020(4) instead of on the constitutional ground.[4] Part of the rape shield statute, this provision permits "cross–examination of the victim on the issue of past sexual behavior when the prosecution presents evidence in its case in chief tending to prove the nature of the victim's past sexual behavior . . ." Camara should have had opportunity to cross–examine T.D. on his prior experiences with anal intercourse, the Court of Appeals reasoned, because the State had "opened the door" on this issue by offering T.D.'s testimony that he did not find anal intercourse pleasurable.

---

[4]RCW 9A.44.020(4) "is directed to the confrontation and cross examination guaranties" of the sixth amendment to the United States Constitution and Const. art. 1, § 22 (amend. 10). *State v. Hudlow,* 99 Wn.2d 1, 15, 659 P.2d 514 (1983).

■ We do not agree that T.D.'s testimony on direct examination opened the door to the sort of cross examination Camara sought to undertake. T.D.'s claim that he does not find anal intercourse pleasurable was nothing more than an expression of his predilections towards the activity at the time he met Camara. Thus, it does not fall within the category of cross examination permitted under RCW 9A.44.020(4). Even to the extent it implies information about T.D.'s sexual past, however, T.D.'s statement did not open the door to cross examination on his sexual past.

Our reasons for rejecting Camara's claimed right to cross–examine T.D. on the latter's sexual past are much the same as those we gave in rejecting a similar claim in *State v. Hudlow*, 99 Wn.2d 1, 659 P.2d 514 (1983). In that case, cross examination of a rape victim on her sexual past was sought after the victim testified on direct examination that when the defendant asked her to perform a "blow job" on him, she told him she did not know how to do that. The victim also indicated in her testimony, however, that she did in fact know what a "blow job" is. We held that no cause for cross examination existed, noting that the testimony had not been elicited in order to demonstrate that the victim "did or did not know what the term 'blow job' meant from personal experience", but was intended simply to determine "whether she understood the meaning of Hudlow's words." *Hudlow*, at 21.

Here, similarly, the State did not ask T.D. about his predilections towards anal intercourse in order to "prove the nature of [T.D.'s] past sexual behavior". T.D. testified that he dislikes anal intercourse to explain why he had told Camara that he was not interested in having anal intercourse.[5] The scope or nature of T.D.'s past experiences

_____
[5]The statement, in context, was made as follows:

"Q [T.D.], when you said you agreed to be sexual with Al Camara, what agreement did you reach with him?

"A We agreed there would be no intercourse and engage in some oral activity, but mostly kissing and hugging and explicitly stated there was going to be no anal intercourse.

with anal intercourse had no bearing on this explanation,[6] and were not inquired into by the prosecution.

There is a sense in which T.D.'s testimony might have *implied* an assertion concerning his past sexual behavior. For example, it might be inferred from T.D.'s claim that he dislikes anal intercourse that T.D. has experienced anal intercourse; how else could he know that he dislikes it? Even assuming such an inference is plausible, however, its possibility does not "open the door" to cross examination about T.D.'s sexual past.

To hold that evidence which *in any manner* concerns a rape victim's past sexual behavior affords an opportunity for cross examination about the victim's sexual past would weaken the statutory shield protecting victims from disclosures of their prior sexual conduct. We do not conceive RCW 9A.44.020(4) to be so broad. Rather, we believe it permits cross examination on a victim's sexual past only when the State's evidence casts the victim's sexual history in a light favorable to the State's case. *See Hudlow,* at 21 (evidence demonstrating the victim's knowledge of the meaning of "blow job" did not open the door to cross examination concerning her sexual past because such evidence was neither "intended [n]or interpreted to convey ideas of [her] sexual virtuousness"); Tanford & Bacchino, *Rape Victim Shield Laws and the Sixth Amendment,* 128

---

"Q Who explicitly stated that?
"A I did.
"Q Can you state whether or not the defendant agreed to that?
"A Yes, he did. He said sure, I am not engaged in that.
"Q Why did you not want to?
"A I didn't want to engage in anal intercourse. It is unsafe, and I don't find it pleasurable."

[6]We are persuaded by the State's characterization of T.D.'s statement:

"You have what I would analogize to a statement: 'I don't drink.' The statement doesn't state that 'I have never [drunk].' It says at this particular time that person does not drink.

"Now, if the victim were to take the stand and say that, 'I have never in my life engaged in unsafe sex,' then I would concede that the State had opened the door."

U. Pa. L. Rev. 544, 583–84 (1980) (defendant should be permitted to rebut evidence casting a favorable light on the victim's sexual history when the State offers such evidence to show the improbability that the victim would have consented to sex with the defendant).

T.D.'s testimony on direct examination that he does not find anal intercourse pleasurable did not cast his sexual past in a favorable light. This testimony revealed, rather than concealed, that T.D. on previous occasions had consensually engaged in anal intercourse. The State's evidence thus created no favorable impression about T.D.'s sexual mores that Camara would need to rebut. And the sort of cross examination Camara sought to undertake could not in any event have cast a less favorable light on T.D.'s testimony.

Again, *Hudlow* is to a great extent controlling. There, we noted that even if cross examination would have disclosed the victim's previous experiences with oral sex, this would not undermine the credibility of the victim's testimony that she knows what a "blow job" is, but told the defendant otherwise at the time he raped her. *See Hudlow,* at 21–22. Similarly, even if Camara could have been successful in eliciting from T.D. on cross examination an admission that T.D. recently had engaged in anal intercourse with other men, this would not contradict the substance of his direct testimony.

For the foregoing reasons, we reverse the judgment of the Court of Appeals and order that Camara's conviction be reinstated.

CALLOW, C.J., and BRACHTENBACH, DOLLIVER, DORE, PEARSON, ANDERSEN, and SMITH, JJ., concur.

UTTER, J. (concurring)—I concur. I believe the Legislature expressly intended to shift the burden of showing consent to the defendant, that there is no constitutional error, and there was no other reversible error in the case.