214 P.3d 968 (2009)
STATE of Washington, Respondent,
v.
Harold H. WRIGHT, Jr., Appellant.
State of Washington, Respondent,
v.
Richy D. Carter, Appellant.
Nos. 36721-1-II, 36741-6-II.
Court of Appeals of Washington, Division 2.
September 1, 2009.
*969 Barbara L. Corey, Sheri Lynn Arnold, Attorneys at Law, Tacoma, WA, Reed Manley Benjamin Speir, Attorney at Law, University Place, WA, for Appellants.
Kathleen Proctor, Pierce County Prosecuting Attorney's Office, Tacoma, WA, for Respondent.
ARMSTRONG, J.
¶ 1 Richy Carter and Harold Wright, Jr., appeal their third degree rape convictions arguing that (1) the trial court erred in providing the lesser-degree third degree rape instruction and (2) insufficient evidence supports their third degree rape convictions. Wright also contends that the prosecutor committed misconduct by notifying the victim before her testimony that her statements in a civil complaint arising from the rape were inconsistent with her proposed testimony and then by arguing during closing argument that the victim's story was consistent. We agree that the trial court erred in giving the third degree rape instruction. Accordingly, we reverse and remand for a new trial.

FACTS
¶ 2 One night in January 2004, 19-year-old S.F. was at a party with her friends, Stephanie Fincham and Jamie Whittaker. The three friends left the party to go to a bar to meet S.F.'s ex-boyfriend. S.F.'s friends went inside the bar because they were 21 years old; later, S.F. sneaked inside to go to the restroom. When she came out of the restroom, her friends were talking with Harold Wright, Jr.; Richy Carter; Harold's brother, Daryl Wright (Daryl); and Jerry McClurkin. S.F. joined them.
¶ 3 S.F. knew Carter because he had lived in the neighborhood where she grew up and because he played basketball with her brother. McClurkin was also her former neighbor. She and the other girls also knew *970 Wright because he worked at Spanaway Lake High School where they had gone to school.
¶ 4 McClurkin invited the girls to come to his house and after the four men picked up beer at a store, the girls followed them to McClurkin's house. At the house, the music was loud and everyone was drinking. S.F. drank tequila and testified that although she did not black out, she did not "really remember everything that night." Report of Proceedings (RP) at 567.
¶ 5 Fincham testified that while she was outside smoking at one point during the night, S.F. came outside wearing only her bra and pants, but S.F. then put on Whittaker's coat. Daryl testified that S.F. was dancing provocatively wearing only her bra. Carter testified that at one point, S.F. was "grinding" with him and was smiling and giggling. RP at 1612-13. McClurkin testified that S.F. danced the same way with him.
¶ 6 Wright also said that S.F. "dance[d] on" him that night. RP at 1395. Wright contends that he and S.F. touched while going through a door at some point during the night. And he might have pushed S.F. on the chest when he was trying to go down the stairs. But he testified that he did not have sexual contact with S.F.
¶ 7 McClurkin said that while he and S.F. were dancing, S.F. began kissing him. McClurkin testified that he and S.F. went upstairs to a bedroom to "make out" and that he removed her sweatshirt and tank top. RP at 1191-92. S.F. stopped and said that she wanted to check on her friends. McClurkin said that they went upstairs again a little while later. Carter testified that he interrupted S.F. and McClurkin while they were upstairs and that he and S.F. began to kiss and touch each other. He said that S.F. appeared to be enjoying it, and she never told him to stop. Carter contends that he and S.F. then had consensual sexual intercourse.
¶ 8 At some point, the girls decided it was time to leave. Fincham and S.F. went upstairs to look for their shoes. They looked in a dark room; S.F. could see a bed in it, but she could not see who was in the room. S.F. testified that somebody pulled her into the bedroom and pushed Fincham out.
¶ 9 S.F. testified that someone held her down on her back on the bed by holding down her left shoulder and pulled her clothes off. She stated that she did not willingly take off her clothes. After unsuccessfully trying to push the person off of her, she felt a man's hands and penis touching and penetrating her vagina. It felt like one man was holding her down while another man penetrated her. She said that it felt like two different men put their penises inside of her. Someone also kissed and rubbed her breasts. S.F. did not scream, but she remembers saying, "Stop," and "This isn't right." RP at 585. She was scared. A man's voice told her, "It's okay. Everything is okay," but she could not identify the voice. RP at 590-91. S.F. was not able to get up off of the bed until they got off of her.
¶ 10 On her way out of the room, S.F. felt a man grab her and say, "Come on, more, more," and "Don't ever tell anyone about this." RP at 595-99. S.F. thought Wright made the statements because she felt a leather jacket when the man grabbed her, and only Wright was wearing one that evening. S.F. did not know whether Wright had intercourse with her. She thought the men used condoms. When McClurkin cleaned up after the party, he threw away one or two condom wrappers from the bedroom.
¶ 11 While S.F. was in the upstairs bedroom, Fincham tried to open the bedroom door. It felt like someone was holding the door shut, but Fincham did not hear any noise from inside the room. Fincham thought Carter and Wright were in the room, but she recalled during an interview that Wright was in the kitchen when she got downstairs. Wright similarly testified that he had gone upstairs, poked his head through a partially open bedroom door, and saw three or four people inside; he told them that "it's time to go." RP at 1410. He alleges that he saw a man and woman on the bed and heard some moaning.
¶ 12 Wright was in the kitchen with Fincham, Whittaker, and another person by the time S.F. came downstairs; Fincham testified that Wright was in the kitchen for at *971 least 10 minutes before the girls left the house. Fincham said that she spoke to S.F. after S.F. came downstairs, and S.F. pulled her into the bathroom. S.F. was "freaked out," shaking, and told Fincham, "We have to go. We have to leave now. I've been raped. We need to leave." RP at 373. Whittaker also said that S.F. looked scared and told Whittaker, "We got to go. We got to go," and then left the house. RP at 189-90. S.F. testified that she left the bedroom crying and ran out of the front door to her car. S.F. started the car and waited for her two friends. She felt scared and did not know what to do. Once they were all in the car, S.F. told her friends, "They raped me. They raped me." RP at 195; 376. S.F. said that Carter knocked on the window and asked what was wrong and why S.F. was crying. The girls then drove away and went to a friend's house.
¶ 13 S.F. was afraid to call the police or tell her parents because she was drunk, driving, and under 21 years old. S.F. eventually went to another friend's house and told her what happened. The friend called S.F.'s mother, and the police came to the house. S.F. gave the police a statement and then went to the hospital.
¶ 14 The sexual assault nurse testified that the physical findings of S.F.'s exam could be consistent with consensual sex but they were not necessarily inconsistent with S.F.'s account of the events. S.F. was emotional and upset when she met with the nurse. S.F. had no physical injuries, but she did have a small amount of vaginal bleeding, which could have been related to her menstrual cycle. The hospital collected deoxyribonucleic acid (DNA) samples from underneath S.F.'s fingernails, her vagina, her mouth, and her chest. The hospital also examined S.F.'s clothes. She was not wearing a bra when she arrived at the hospital.
¶ 15 Carter's DNA matched the semen taken from S.F.'s vagina, and DNA from S.F.'s chest matched Wright's DNA. The DNA on S.F.'s chest could have come from saliva or shredded skin cells. It was sufficient to show significant or heavy contact. None of the DNA recovered from S.F. matched DNA from the other two men at the house that night.
¶ 16 The State charged Carter and Wright with second degree rape and an alternative charge of indecent liberties against Wright. The trial court consolidated the cases.
¶ 17 The State submitted a jury instruction for the lesser-degree crime of third degree rape. Both defendants objected, arguing that no factual basis supported the instruction because S.F. always contended that she was forced to have sex and that she was restrained during the act. The prosecutor argued that because there was no physical evidence of force, only S.F.'s testimony as to force, that the jury could find lack of consent without force. Although the prosecutor argued during closing that S.F. was held down and overcome by physical force, the prosecutor maintained that the jury could find that the force was insufficient to overcome resistance. The trial court ruled that the evidence supported a third degree rape instruction.
¶ 18 Because the jury was unable to reach a verdict on second degree rape, it left the second degree rape verdict form blank. But it convicted Carter and Wright of third degree rape.

JURY INSTRUCTIONS
¶ 19 Carter and Wright argue that the trial court erred in giving a third degree rape instruction, asserting that it should not have been included as a lesser-degree charge to the charge of second degree rape. We review de novo a trial court's decision to give an instruction based on a ruling of law. State v. Brightman, 155 Wash.2d 506, 519, 122 P.3d 150 (2005). If the court's decision is based on a factual dispute, we review it for an abuse of discretion. Brightman, 155 Wash.2d at 519, 122 P.3d 150. A trial court may not submit a theory to the jury for which there is insufficient evidence. State v. Munden, 81 Wash.App. 192, 195, 913 P.2d 421 (1996). We review the evidence in the light most favorable to the instruction's proponent. State v. Fernandez-Medina, 141 Wash.2d 448, 455-56, 6 P.3d 1150 (2000).

*972 A. Third Degree Rape Instruction

¶ 20 Third degree rape is not a lesser included offense of second degree rape; rather, it is an inferior degree offense. State v. Ieremia, 78 Wash.App. 746, 753-54, 899 P.2d 16 (1995). Under RCW 10.61.003, "the jury may find the defendant not guilty of the degree charged in the indictment or information, and guilty of any degree inferior thereto...." For the trial court to instruct on an inferior degree offense, the evidence must support an inference that only the lesser crime was committed. Ieremia, 78 Wash. App. at 754-55, 899 P.2d 16.[1] In other words, the evidence must permit a rational juror to find the defendant guilty of the lesser offense and acquit him or her of the greater. Fernandez-Medina, 141 Wash.2d at 456, 6 P.3d 1150 (quoting State v. Warden, 133 Wash.2d 559, 563, 947 P.2d 708 (1997)).
¶ 21 To prove second degree rape, the State must present evidence that, the defendant had sexual intercourse with the victim by forcible compulsion. See RCW 9A.44.050(1)(a). Forcible compulsion means that "the force exerted was [1] directed at overcoming the victim's resistance and [2] was more than that which is normally required to achieve penetration." State v. McKnight, 54 Wash.App. 521, 528, 774 P.2d 532 (1989). In comparison, third degree rape requires the State to prove the defendant had sexual intercourse with a person who was not the defendant's spouse, who did not consent to the act, and who clearly expressed lack of consent by words or conduct; it does not require forcible compulsion. RCW 9A.44.060(1)(a). It specifically requires circumstances "not constituting rape in the ... second degree[ ]...." RCW 9A.44.060(1) (emphasis added).
¶ 22 The trial court may not instruct on third degree rape as an inferior degree offense to second degree rape when the defendant contends that the intercourse was consensual and the victim testifies that the intercourse was forced. See State v. Charles, 126 Wash.2d 353, 355-56, 894 P.2d 558 (1995); Ieremia, 78 Wash.App. at 756, 899 P.2d 16. The trial court here found Charles and Ieremia distinguishable. We disagree, and find that the trial court erred by giving the third degree instruction because neither S.F.'s testimony nor the defendants' evidence supported an unforced, nonconsensual rape.
¶ 23 In Charles, the State charged the defendant with second degree rape. The victim testified that the defendant grabbed her, pushed her, and took off her clothes. Charles, 126 Wash.2d at 354, 894 P.2d 558. She testified that she struggled to get away. Charles, 126 Wash.2d at 354, 894 P.2d 558. The defendant testified that the victim consented to intercourse. Charles, 126 Wash.2d at 355-56, 894 P.2d 558. The court reasoned that if the jury believed the victim, the defendant was guilty of second degree rape. Charles, 126 Wash.2d at 355, 894 P.2d 558. But, if the jury believed the defendant, he was not guilty of any degree of rape. Charles, 126 Wash.2d at 355-56, 894 P.2d 558. The court concluded that the trial court properly refused to instruct the jury on third degree rape because, to convict, the jury would have had to disbelieve the defendant's claim that the intercourse was consensual and also disbelieve the victim's testimony that the act was forcible. Charles, 126 Wash.2d at 356, 894 P.2d 558.
¶ 24 Similarly, in Ieremia, the court held that a third degree rape instruction was improper because the jury had to either believe the defendants' consent defenses or find them guilty of second degree rape because the victims' testimony supported second degree forcible rape. Ieremia, 78 Wash.App. at 755-56, 899 P.2d 16. In that consolidated case, one victim testified that one of the defendants grabbed her by the arms, carried her to a bedroom, covered her mouth, and took off her clothes before he raped her. Ieremia, 78 Wash.App. at 749-50, 899 P.2d 16. She resisted by asking him to stop and by slapping him. Ieremia, 78 Wash.App. at 749, 899 P.2d 16. There were signs of physical trauma. Ieremia, 78 Wash.App. at 749, 899 P.2d 16. A second victim testified that *973 the other defendant grabbed her wrists and covered her mouth, despite her attempt to struggle and scream. Ieremia, 78 Wash. App. at 749-50, 899 P.2d 16. There was no evidence of physical trauma to the second victim. Ieremia, 78 Wash.App. at 750, 899 P.2d 16. The defendants maintained that the intercourse was consensual. Ieremia, 78 Wash.App. at 750, 899 P.2d 16. The court found, as it did in Charles, that a third degree rape instruction was improper: the jury could either convict under second degree rape if it believed the victim, or it could acquit if it believed the defendants. Ieremia, 78 Wash.App. at 756, 899 P.2d 16.
¶ 25 Forcible compulsion is also discussed in McKnight, 54 Wash.App. 521, 774 P.2d 532. In McKnight, the court found that there was sufficient evidence to convict of second degree rape when the defendant slowly pushed the victim to a prone position (onto a mattress) and removed her clothes, despite the victim's request to stop. McKnight, 54 Wash.App. at 522-23, 528, 774 P.2d 532. The court found that a reasonable juror could "infer from the evidence that these were acts of force over and above what is necessary to achieve intercourse" and that the defendant's conduct was intended to overcome the victim's resistance. McKnight, 54 Wash.App. at 528, 774 P.2d 532. Thus, the court affirmed a second degree rape conviction and rejected the defendant's claim that the act was consensual. McKnight, 54 Wash.App. at 529, 774 P.2d 532.
¶ 26 The State maintains that S.F.'s testimony could be consistent with only third degree rape because her description of the incident does not involve force that is more than necessary or usual to achieve penetration. The State points out that S.F. said she was held down in a manner that felt like someone leaning over her, and that only the weight of that individual held her down. But S.F. also testified that (1) she was pushed or pulled into the room; (2) she did not willingly lay down on the bed; (3) someone pulled her clothes off of her body; she did not willingly remove them; (4) she was held down on the bed by the body weight of one man while another man penetrated her; (5) something on her left side was holding her shoulder back so that she could not get up; and (6) she told them to stop. Although S.F. was reluctant to say that she was "raped" because she does not like that word, her testimony consistently reflected rape by forcible compulsion.
¶ 27 The dissent relies on State v. Fernandez-Medina, 141 Wash.2d 448, 6 P.3d 1150 (2000), for the proposition that an inferior degree offense instruction was warranted in this case. But Fernandez-Medina is distinguishable.
¶ 28 In Fernandez-Medina, the State presented evidence from which the jury could find that only the lesser degree offense (second degree assault) occurred. The difference in the degree of assault turned on intent; specifically, whether the noise from a gun click showed the defendant's intent to do great bodily harm to the victim. Fernandez-Medina, 141 Wash.2d at 456-57, 6 P.3d 1150. But because there was expert testimony before the jury that (1) the clicking noise could have occurred without the defendant pulling the trigger (thus supporting second degree assault) and (2) that the clicking noise could have been caused by the defendant intentionally pulling the trigger (evidencing first degree assault), the court held that the lesser second degree instruction was proper. Fernandez-Medina, 141 Wash.2d at 451, 456-57, 6 P.3d 1150. Here, on the other hand, the record does not show that either rape in the second degree or rape in the third degree could have occurred; the State presented evidence only of forcible intercourse. Thus, Fernandez-Medina does not compel a lesser degree instruction.
¶ 29 We conclude that as in Charles and Ieremia, S.F.'s testimony supports only second degree rape and the defendant's evidence supports only that no rape occurred. The trial court erred in giving the third degree rape instruction.
¶ 30 Because the jury left the second degree rape verdict form blank after the court instructed the jury to leave it blank if the jurors were unable to reach a verdict on second degree rape, double jeopardy principles do not bar retrial on that charge. State v. Daniels, 160 Wash.2d 256, 262-64, 156 P.3d 905 (2007), adhered to on recons., 165 *974 Wash.2d 627, 200 P.3d 711 (2009). Consequently, we reverse the third degree rape convictions and remand for retrial on the second degree rape charges. And we do not discuss the other issues defendants raised because they are unlikely to rise on retrial.
I concur: VAN DEREN, C.J.
HUNT, J.
¶ 31 I respectfully dissent. Because the evidence supports giving the inferior third-degree-rape instruction, I disagree with the majority's holding that the trial court abused its discretion and committed reversible error in giving this instruction over Wright and Carter's objection. I would affirm.

I. STANDARD OF REVIEW
¶ 32 I agree with the majority that a trial court may not submit a theory to the jury for which there is insufficient evidence. State v. Munden, 81 Wash.App. 192, 195, 913 P.2d 421 (1996). We review the evidence in the light most favorable to the proponent of the instruction. State v. Fernandez-Medina, 141 Wash.2d 448, 455-56, 6 P.3d 1150 (2000). When a trial court's decision to give an instruction rests on a factual determination, we review the decision for abuse of discretion. State v. Walker, 136 Wash.2d 767, 771-72, 966 P.2d 883 (1998). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. State v. Jensen, 149 Wash.App. 393, 399, 203 P.3d 393 (2009). In my view, Wright and Carter fail to meet this burden here.

II. NO ABUSE OF TRIAL COURT DISCRETION
¶ 33 The majority cites State v. Charles, 126 Wash.2d 353, 894 P.2d 558 (1995) and State v. Ieremia, 78 Wash.App. 746, 749-50, 899 P.2d 16 (1995), review denied, 128 Wash.2d 1009, 910 P.2d 481 (1996), for the following proposition:
The trial court may not instruct on third degree rape as an inferior degree offense to second degree rape when the defendant contends that the intercourse was consensual and the victim testifies that the intercourse was forced.
Majority at 972. In my view, the law does not support this proposition where the truth, as viewed by the jury, may lie somewhere between the extremes of the defendant's and the victim's seemingly mutually exclusive testimonies. In spite of the majority's characterization to the contrary, I agree with the State that "the jury could find lack of consent without force" based on the record before us. Majority at 971.

A. Fernandez-Medina

¶ 34 Our Supreme Court has rejected[2] the absolute proposition that the majority posits here. Majority at 972. In Fernandez-Medina, the State charged the defendant with first degree assault. Fernandez-Medina, 141 Wash.2d at 451, 6 P.3d 1150. At trial, the defendant claimed that he had not been present at the victim's location at the time of the alleged assault; he also requested an inferior degree jury instruction on second degree assault. Id. at 451-52, 6 P.3d 1150. The trial court denied the defendant's request for the inferior degree instruction. Id. at 452, 6 P.3d 1150. On appeal, the State argued that because the defendant had presented *975 an alibi defense at trial, denying that he had assaulted the victim in any degree, he was not entitled to an instruction on an inferior degree offense. Id.
¶ 35 Rejecting the State's argument, our Supreme Court stated that such a proposition
would empower trial courts to deny a request for an instruction on the basis that the theory underlying the instruction is "inconsistent" with another theory that finds support in the evidence. This would require the judge presiding at a jury trial to weigh and evaluate evidence, and would run afoul of the well-supported principle that "[a]n essential function of the fact finder is to discount theories which it determines unreasonable because the finder of fact is the sole and exclusive judge of the evidence, the weight to be given thereto, and the credibility of witnesses."
Id. at 460, 6 P.3d 1150 (quoting State v. Bencivenga, 137 Wash.2d 703, 709, 974 P.2d 832 (1999)). Accordingly, the Supreme Court held that an inferior degree offense instruction is warranted when substantial evidence in the record raises an inference that only the lesser included or inferior degree offense was committed, even if this lesser included or inferior degree offense is inconsistent with another theory of the case proposed by the party requesting the instruction. Fernandez-Medina, 141 Wash.2d at 460-61, 6 P.3d 1150. Such is the case here.

B. Charles and Ieremia

¶ 36 Consistent with Fernandez-Medina, neither Charles nor Ieremia stand for the majority's absolute proposition that a party's inconsistent theories of a case warrant automatic denial of a request for a lesser degree jury instruction. The State charged Charles with second degree, forcible rape. Charles, 126 Wash.2d at 354, 894 P.2d 558. The victim testified that Charles forced her to the ground, they struggled, and Charles forced her to have sexual intercourse with him. Id. at 354, 894 P.2d 558. Charles testified that he and the victim had consensual intercourse. Id. at 355, 894 P.2d 558. There was no evidence that the sexual intercourse was nonconsensual but not forcible. Nevertheless, Charles's defense counsel requested an instruction on the lesser third degree rape. Id. at 355, 894 P.2d 558.
¶ 37 The Supreme Court upheld the trial court's refusal to give the lesser offense instruction because (1) there was "no affirmative evidence that the intercourse was unforced but still nonconsensual"; and (2) as a result, "the jury would have had to disbelieve both Charles' claim of consent and the victim's testimony that the act was forcible." Majority at 972 (emphasis added) (citing Charles, 126 Wash.2d at 356, 894 P.2d 558). It was this lack of evidence of third degree rape and this lesser offense's absolute inconsistency with both the victim's and the defendant's testimonies on which the court based its holding.
¶ 38 Similarly, in Ieremia, a consolidated case, the first victim testified that Singh grabbed her by the arms, carried her to a bedroom, took off her clothes, raped her, and covered her mouth with his hand when she cried out for him to stop and protested repeatedly that she wanted to go home. Ieremia, 78 Wash.App. at 749, 899 P.2d 16. She further attempted to resist by slapping Singh. Id. A physician who had examined the victim immediately after the rape testified that the victim's pelvic area had been traumatized, her vaginal area was torn, and she had multiple bruises and abrasions on her arms, back, breasts, and other parts of her body. Id.
¶ 39 The second victim testified that the other defendant, Ieremia, grabbed her wrists and pulled her to his car. Id. at 749-50, 899 P.2d 16. She protested and tried to pull away, but she did not scream or call for help. Id. at 749, 899 P.2d 16. Ieremia drove her to a nearby park, pulled her hair, covered her mouth to muffle her screams, overcame her struggles, and raped her. Id. at 749-50, 899 P.2d 16.
¶ 40 Both Singh and Ieremia claimed that the intercourse in each case was consensual. Id. In affirming the trial court's denial of a third degree rape instruction in both cases, Division I of our court did not base its holding entirely on the victims' having testified only that the rapes were forcible (second degree rape) and the defendants' having testified *976 solely that the sexual intercourses were consensual. Rather, the court discussed Charles, noted that there was "no other testimony"[3] supporting an inference of third degree rape for the jury to consider, Id. at 755, 899 P.2d 16, and concluded that "[a]s in Charles, there was no affirmative evidence that the intercourse was unforced but still nonconsensual" and, therefore, the defendants were not entitled to a third degree rape instruction. Id. at 756, 899 P.2d 16 (emphasis added).
¶ 41 In short, neither Charles nor Ieremia[4] warranted a lesser third degree rape instruction because both cases lacked affirmative evidence supporting the inference that only unforced, but nonconsensual, intercourse occurred. Furthermore, Fernandez-Medina is both closer factually and 10 years more recent than Charles and Ieremia. In my view, therefore, Fernandez-Medina provides controlling authority: Fernandez-Medina would have compelled reversal if the trial court here had refused to give the third degree rape instruction; but because the trial court exercised its discretion and gave the instruction, Fernandez-Medina requires affirmance. See Fernandez-Medina, 141 Wash.2d at 462, 6 P.3d 1150 (When substantial evidence in the record affirmatively raises the inference that the defendant is guilty of only a lesser degree offense, the trial court should instruct on that lesser offense). The same rule applies to an inferior degree offense instruction. Fernandez-Medina, 141 Wash.2d at 456, 6 P.3d 1150.

C. Evidence Warranted Inferior Degree Instruction Here
¶ 42 In contrast with Charles and Ieremia, supporting evidence here warranted the trial court's giving an inferior degree offense instruction. Describing the physical circumstances of the rape, SF testified that someone pulled her into the room and onto the bed where the rape occurred, but she did not yell or shout for help. Although SF testified that someone had held down her left shoulder to keep her down on the bed, she also stated that the experience felt like someone was leaning over her and that only the weight of the individual held her down. She further testified that defendants Wright and Carter did not hold her down in a painful manner, she told them to "stop," but she did not scream or yell out, and at first, she did not remember trying to push anyone off her.[5] Particularly noteworthy was SF's testimony that she did not like to use the word "rape" to describe what happened to her because that was a "strong word," but that the sexual intercourse was nonconsensual. Consistent with SF's testimony, the nurse who had conducted SF's post-rape examination testified that she saw no injuries or bruising, SF did not report being in any pain, and the examination's findings were consistent with consensual intercourse.[6] Thus, the evidence was *977 ambiguous about the degree of force, if any, the defendants used to consummate the nonconsensual sexual intercourse with SF.
¶ 43 The evidence could support several inferences. The physical contact SF described could be consistent with consensual, nonconsensual, or forcibly compelled sexual intercourse. Her description of the rape does not necessarily indicate any use of force greater than the force normally required to achieve penetration. See State v. McKnight, 54 Wash.App. 521, 528, 774 P.2d 532 (1989). Viewed as a whole and in a light most favorable to the State's proposed instruction, the evidence and testimony supports a reasonable inference that the sexual intercourse was not forcibly compelled, but was still nonconsensual. Thus, a rational trier of fact could have believed SF's testimony and reached a conclusion that only third degree rape was committed.
¶ 44 This is what the jury did here. Given a choice between convicting Wright and Carter of second and third degree rape, the jury left blank the second degree rape verdict form and instead found the evidence sufficient to convict the defendants of the inferior third degree rape. Therefore, the trial court's exercise of its considerable discretion in giving a third degree rape instruction under these extremely close facts was not "manifestly unreasonable or based on untenable grounds." I strongly, but respectfully, disagree with the majority's decision to the contrary. Accordingly, I dissent from the majority's reversal of Wright and Carter's third degree rape convictions on grounds of abuse of discretion.[7] I would affirm.
NOTES
[1] Only the factual prong of the Workman test need be satisfied to instruct the jury on a lesser degree offense. Ieremia, 78 Wash.App. at 755 n. 3, 899 P.2d 16; see State v. Workman, 90 Wash.2d 443, 447-48, 584 P.2d 382 (1978).
[2] I further note that Division One of our court has also implicitly rejected the proposition posited by the majority here. Ieremia, 78 Wash.App. at 757, 899 P.2d 16. In State v. Gostol, Division One also noted that a lesser included offense instruction analysis does not necessarily turn on

the argument or theory advanced by the party who asks for a lesser included offense instruction. Rather, it turns on whether evidence is presented by either party from which the necessary inference may be drawn. A defendant may argue for acquittal and yet also be entitled to an instruction on a lesser included offense.
92 Wash.App. 832, 838, 965 P.2d 1121 (1998) (footnote omitted).
I agree with the majority that only the factual prong of the Workman test, whether the facts warrant an inferior degree instruction, is at issue here. Majority at 8, n. 1; see State v. Workman, 90 Wash.2d 443, 447-48, 584 P.2d 382 (1978). Under Workman's factual prong, the analyses for determining the propriety of giving lesser included and inferior degree instructions are identical. See Fernandez-Medina, 141 Wash.2d at 454-55, 6 P.3d 1150. Therefore, the above quoted language from Gostol, also involving the factual prong of the Workman test, applies with equal persuasiveness here.
[3] Division One's recent decision in State v. Buzzell, 148 Wash.App. 592, 200 P.3d 287 (2009), continues to follow this rationale. Buzzell testified that the sexual intercourse was consensual; the victim testified that the sexual intercourse was forcibly compelled. Id. at 601, 200 P.3d 287. The court noted that (1) "according to the testimony, the sexual contact was either through forcible compulsion or it was consensual"; and (2) "[l]ike Charles, the evidence supported that Buzzell either used forcible compulsion or that [the victim] consented to the sexual contact" and upheld the trial court's refusal to give a jury instruction on third degree rape. Id. at 604-05, 200 P.3d 287 (emphasis added).
[4] Furthermore, Charles and Ieremia do not present the same procedural posture as does the case before us: Affirming a trial court's refusal to give a lesser included offense instruction, as the courts did in Charles and Ieremia, is not analogous to the majority's reversal here based on the trial court's giving an inferior degree offense instruction. Charles and Ieremia affirmed the trial court's exercise of discretion. I would do the same here.
[5] After she refreshed her recollection by reading a statement she had made a few days after the rape, she recalled unsuccessfully having tried to push her assailants off.
[6] I acknowledge that, in Ieremia, Division One reasoned that the second victim's lack of physical injury and failure to struggle or yell tended to support only Ieremia's claim of consent, not an inference of lack of consent. Ieremia, 78 Wash.App. at 756, 899 P.2d 16. As I have already noted, however, Ieremia lacked any other testimony or affirmative evidence supporting an inference that the sexual intercourse was nonconsensual but not forcibly compelled. Unlike Ieremia, the victim's own testimony here supports third degree rape and, arguably even consensual sexual intercourse, as well as second degree rape. Thus, viewing all evidence together, a rational trier of fact could find that the sexual intercourse was forcible, non-forcibly nonconsensual, or consensual.
[7] For purposes of clarification, I note that (1) the majority reverses based on insufficiency of evidence supporting the giving of an instruction on third degree rape, as opposed to insufficiency of evidence supporting the jury's convictions for third degree rape; and (2) the majority properly declines to address others issues the defendants raise on appeal, including their challenge to the sufficiency of the evidence supporting their convictions. In my view, the majority thereby implicitly recognizes that the State is not precluded from recharging and retrying Wright and Carter for third degree rape on remand. At a retrial, the State should be able to adduce other facts supporting a third degree rape instruction, which the trial court will need to evaluate anew to determine the appropriate "to convict" jury instructions. We cannot prejudge such evidence now.